UNITED STATE DISTRICT COURT
WESTERN DISTRICT OF TEXAS
Austin Division

ANDREW FREDERICK SMITH,

    Plaintiff,

v.                                       CIVIL ACTION NO. _____

EQUIFAX INFORMATION SERVICES, LLC,

    Defendant.

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **ANDREW FREDERICK SMITH**, by and through his undersigned counsel, alleges the following against Defendant Equifax Information Services, LLC ("Defendant" or "Equifax").

## PRELIMINARY STATEMENT

1. This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §§ 1681–1681x.

2. Today in America there are three major consumer reporting agencies, Equifax Information Services, LLC (hereinafter "Equifax"), Trans Union, LLC (hereinafter "Trans Union") and Experian Information Solutions, Inc. (hereinafter "Experian") (collectively, the "CRAs").

3. The FCRA demands of reporting agencies like Equifax that it utilize reasonable procedures to assure the maximum possible accuracy of the information it reports. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, Equifax must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

3. Consumer reporting agencies that create consumer reports, like Equifax, are charged with using reasonable procedures designed to ensure the maximum possible accuracy of

the information they report. It is not enough for Equifax to simply parrot information it receives from entities like Verizon, particularly where a consumer makes a dispute about information reported.

4. Also when a consumer like Plaintiff disputes the accuracy of information through the CRAs, those disputes are transmitted to the party furnishing the information, here Verizon. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

5. Plaintiff brings claims under FCRA Section 1681e(b) against Equifax because it reported about Plaintiff inaccurate information regarding a Verizon account. When Plaintiff disputed the inaccuracies, the agencies did not reasonably investigate, also violating Section 1681i.

6. The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Equifax has complied with its now 50-year-old obligation to conduct a meaningful accuracy investigation. Equifax has been repeatedly sued by consumers, sanctioned by regulators and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had Equifax followed that advice and heeded those warnings, the Plaintiff would not have been harmed.

## JURISDICTION AND VENUE

7. The jurisdiction of this Court is conferred by 15 U.S.C. § 1681p and 28 U.S.C> § 1331.

8. Venue is proper in this District as Plaintiff is a resident in this District and Division, the violations described in this Complaint occurred in this District and Division, and the Defendant transacts business within this District and Division.

## PARTIES

9. Plaintiff Andrew Frederick Smith is a natural person and "consumer" as defined by § 1681a(c).

10. Defendant Equifax Information Services, LLC is headquartered in Georgia and does business in the State of Texas through its registered agent.

11. Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of Defendant's Creditor-Customers*

12. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

13. "Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

14. "The…FCRA…was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond*, 45 F.3d at 1333).

15. Section 1681i(a), on the other, hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through his dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

16. Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching

inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

17. It has long been the law that a CRA, such as Equifax, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

18. That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

19. As the Fourth Circuit explained in *Johnson v. MBNA*:

The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see

> Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

20. Further, as Equifax is aware, this Court has held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendant has a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

21. It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

---

[1] *Available at* https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

### *Plaintiff Discovers Defendant Was Inaccurately Reporting a Verizon Collections Account that Does Not Belong to Him and Disputes Those Inaccuracies*

22. Plaintiff is the victim of identity theft.

23. An unknown individual opened a Verizon utility account in Plaintiff's name using his personal identifiers.

24. On or about September 25, 2020, Plaintiff received a call from a Verizon representative requesting that he verify his identity to complete opening an account for home service in New York City, New York. Plaintiff informed Verizon that he did not request or authorize anyone to open a Verizon account for residential services in New York City. Plaintiff was advised by Verizon the account would not be opened since Plaintiff did not authorize the account to be opened.

25. Despite Verizon's assurance to the contrary and Plaintiff directly advising Verizon that he did not request or authorize anyone to open a Verizon account for residential services in New York City, Verizon opened an account for residential services in New York City using Plaintiff's identity.

26. In or around February 2021, Plaintiff received a letter from Verizon, stating that it had "received an inquiry regarding service number" 91XXXX and requesting a call from Plaintiff. Fearful that Verizon allowed the identity theft to proceed in spite of its prior assurance to the contrary, Plaintiff promptly contacted Verizon to dispute his obligation for any Verizon account and prevent any further harm resulting from Verizon's facilitation of identity theft.

27. Verizon, via two separate representatives, assured Plaintiff that there was no account in his name and nothing to be concerned about. Plaintiff provided his full Social Security

number to a representative of Verizon's fraud department, and this representative assured Plaintiff that there was no Verizon account associated with his Social Security number.

28. In or around May or June 2021, Plaintiff was applying for an auto loan from Blue Bonnet Dodge in New Braunfels, Texas, at which time he discovered that Verizon was reporting the account as in collections. Because of various family matters and a vacation, Plaintiff was unable to expend additional time attempting to resolve Verizon's facilitation of identity theft.

29. In or around July 2021, Plaintiff disputed the Verizon collections account with Verizon. Plaintiff called Verizon's Fraud Department and verified his Social Security number and stated that the account did belong to him. Plaintiff was told by Verizon there was nothing more to do as there was no breach recorded or delinquent account attached to Plaintiff's Social Security number. Plaintiff advised Verizon that it was reporting a collections account to on his credit report. Verizon's Fraud Department asked Plaintiff to file a police report.

30. On July 24, 2021, Plaintiff filed a police report for identity theft with the Lampasas County Sheriff's Office (Incident No. 21-003344).

31. On July 28, 2021, Plaintiff submitted a Verizon National Fraud Operations form (Verizon Case No. 917503).

32. On July 28, 2021, in connection with his fraud claim, Plaintiff submitted to Verizon documentation requested by Verizon (copies of his driver's license, Social Security card, and proof of residence during the time of claim)

33. In or around December 2021 or January 2022, Plaintiff applied as a guarantor with Village East TCU for housing for the benefit of his college daughter.

34. On January 3, 2022, Village East TCU denied the housing application due to the Verizon collections account(s) appearing on Plaintiff's credit report.

### *Plaintiff Disputes The Inaccuracies With Equifax*

35. On or about March 16, 2022, Plaintiff submitted a written dispute via Certified Mail to Equifax regarding the Verizon account.

36. On March 22, 2022, Equifax forwarded its investigation results to Plaintiff and advised that it had verified the Verizon account as belonging to Plaintiff. Equifax continued to report the Verizon account as in collections with a past due balance of $2,672.

37. On or about June 21, 2022, Plaintiff submitted a second written dispute via Certified Mail to Equifax regarding the Verizon account.

38. Upon information and belief, Equifax did not respond to Plaintiff's second dispute sent on or about June 21, 2022.

39. Equifax had actual knowledge of these inaccuracies and deliberately chose to ignore and permit the reporting of the inaccurate account.

40. Equifax received Plaintiff's disputes, but in each case wholly and entirely failed to conduct the reinvestigations required by law. Instead, Equifax merely "parroted" the information dictated to it by Verizon.

41. Upon information and belief, Equifax prepared and published to third parties multiple inaccurate consumer reports about Plaintiff that reflected the inaccurate derogatory Verizon account that does not belong to Plaintiff.

### *Equifax Did Not and Does Not*
### *Conduct Any Investigation of Most Consumer Disputes*

42. Unknown to the Plaintiff until this lawsuit, it has long been the practice of Equifax to refuse to perform that statutorily-mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Equifax uses a vendor, previously known as Intelenet Global Services, and now as Teleperformance.

43. This dispute vendor is not hired to perform an actual FCRA investigation. Instead, the vendor's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

44. In fact, Equifax strongly encourages consumers to make disputes through its online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "Not my account."). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax. It gets sent to Equifax's creditor customer (such as Verizon) for its sole review and consideration.

45. Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication. That mailbox company receives consumer disputes, scans them into a batch of other disputes.

46. Equifax then forwards the dispute mail batches to its third-party vendor, Teleperformance, based in Mumbai, India. Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from the Atlanta-based mail company, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

47. Teleperformance agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

48. Equifax has taken the position in other litigation that it has no control over Teleperformance agents. For example, under oath before another court in recent time, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fl. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

49. Regardless of whether or not these statements are correct, Equifax believes that it cannot direct, control, manage or reliably influence the employees of its third-party outsource vendor.

50. Equifax itself did not conduct any reinvestigation of Plaintiff's disputes. Instead, Equifax merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### *Plaintiff Suffered Actual Harm*

51. Equifax continued to report the derogatory, disputed Verizon account on the Plaintiff's credit reports, despite being notified that this information was false and the account does not belong to Plaintiff.

52. Plaintiff attempted to resolve these matters with Equifax and his credit was significantly destroyed by Equifax's failure to correct the inaccurate reporting.

53. Plaintiff is a fully disabled veteran of the United States Army suffering from post-traumatic stress disorder.

54. As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

   a. Stress associated with being denied the ability to obtain housing for his college-aged daughter and being denied the ability to obtain financing for an automobile;

   b. Monies lost by attempting to fix his credit, e.g. communication costs, postage for disputes;

   c. Loss of time attempting to cure the error;

   d. Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

   e. Stress associated with attempting to resolve this matter in the last year.

   f. Embarrassment with having to explain to his college-aged daughter why their housing application was denied.

### *Defendants' Conduct Was Willful*

55. The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

56. Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

57. As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. Equifax's

dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Equifax's "grave responsibilities" to ensure accuracy has not changed.

58. Equifax has received many thousands of disputes and other complaints regarding Verizon—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

59. Just in federal court alone, during the last decade the creditor-furnisher disputed by Plaintiff has had to defend numerous consumer lawsuits and arbitrations.

60. In many of these FCRA lawsuits and arbitrations brought by a consumer, Equifax was a named defendant in that proceeding or a prior or subsequent proceeding.

61. Equifax knew or should have known of this litigation history. It uses and has access to PACER and other resources to investigate and monitor such consumer complaints.

62. The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendant, and/or to other government agencies, attorneys, or non-profit organizations.

63. Equifax regularly receives unredacted consumer dispute details from this database.

64. Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

65. Further, over 35,000 of the CFPB complaints against Equifax were based largely on its failure to reasonably investigate consumer disputes.

66. Further, consumers have submitted complaints about Verizon to the CFPB regarding its credit reporting.

67. Just in the last 12 months alone, Equifax has been sued on by consumers alleging its violation of the FCRA over 2,000 times. Most of these alleged that the Defendant violated §

1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

68. While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Equifax on notice of the failures of its dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed Equifax on notice that it may not merely "parrot" what their creditor-customer tells it if the consumer had provided a substantive and detailed dispute.

69. Equifax had actual notice from numerous other courts that its blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"). *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073–74 (D. Or. 2011) ("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

70. Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b)

Page 14

> (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.; see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau*, 608 F.Supp. 972, 976 (M.D. Fla. 1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

71. Equifax has also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

72. In 2015, a large group of state Attorneys General forced a consent order from the CRAs by which they were required to develop procedures necessary to comply with the FCRA.[2] The AG Settlement required amongst many changes and mandates that the CRAs comply with § 1681i(a).

73. The AG Settlement also required Equifax to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these requirements, Equifax did not meaningfully comply with the AG Settlement in these regards.

---

[2] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

74. Equifax is also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by the CRAs to include Equifax when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[3]

75. The NCLC Report summarized its context:

> Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

76. Among many of the CRAs' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

---

[3] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two or three digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

77. Despite the notice and judicial, regulatory and public interest criticism, Equifax has refused to change its dispute investigation process because it would cost too much money to do so.

78. Equifax's procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of § 1681e(b) of the FCRA - against Equifax**

79. Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

80. Defendant Equifax willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files it published and maintained concerning the Plaintiff.

81. As a result of this conduct, action and inaction of Equifax, Plaintiff suffered damage by loss of credit, loss of the ability to purchaseand benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and emotional

pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why she lost the ability to benefit from credit.

82. Further, after Plaintiff's disputes put Equifax on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of its creditor-customers, Equifax ignored such information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of the Plaintiff's credit reports.

83. Equifax furnished multiple consumer reports to third parties containing the inaccurate tradeline information and upon information and belief, Equifax did so after receiving notice of these inaccuracies.

84. Equifax's conduct, action and inaction was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

85. As a result of Equifax's violations of 15 U.S.C. § 1681e(b), the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

86. Plaintiff is entitled to recover his costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### Violation of § 1681i of the FCRA - against Equifax

87. Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

88. Equifax willfully violated 15 U.S.C. § 1681i by failing to delete inaccurate information in the Plaintiff's consumer file after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant information to Plaintiff's creditors and/or creditors' attorneys; by failing to maintain reasonable procedures with

which to filter and verify disputed information in the Plaintiff's credit file; and by relying upon verification from a source it has reason to know is unreliable.

89. Further, Equifax violated Section 1681i by conducting *no investigation at all*. Section 1681i demands that when Plaintiff notified Equifax directly of his disputes, Equifax must investigate those disputes. The statute does not contemplate someone other than Equifax conducting the investigation.

90. Yet, Equifax used an unrelated third party, Teleperformance, over which it lacks control, to conduct its investigations. Teleperformance is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Equifax therefore violated 1681i on this basis because it sent Plaintiff's disputes away to acompany that was not its controlled agent rather than investigating them as required.

91. As a result of Equifax's violations of 15 U.S.C. § 1681i, Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

92. Equifax's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

93. Plaintiff is entitled to recover his costs and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## JURY DEMAND

94. Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for actual, statutory, treble, and punitive damages against Equifax; for his attorneys' fees and costs; for prejudgment and postjudgment interest at the judgment rate; specific performance and injunctive relief; and such other relief the Court deems just and proper.

December 19, 2023

                                                              Respectfully Submitted,

**ANDREW FREDERICK SMITH**

By: _/s/ Craig C. Marchiando_
Craig C. Marchiando
Texas Bar Card No. 24046347
**Consumer Litigation Associates, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: craig@clalegal.com